# IN THE COURT OF APPEALS OF IOWA

No. 15-1968
Filed March 23, 2016

**IN THE INTEREST OF D.R., T.H., C.S., AND E.L.,**
**Minor Children,**

**T.H., Mother,**
Appellant,

**D.A.R., Father,**
Appellant,

**C.S., Father,**
Appellant.

_____

Appeal from the Iowa District Court for Linn County, Barbara H. Liesveld, District Associate Judge.

A mother and two fathers separately appeal the termination of their parental rights. **AFFIRMED ON ALL APPEALS.**

Carrie K. Bryner, Cedar Rapids, for appellant mother.

John D. Jacobsen of Jacobsen, Johnson, & Wiezorek, P.L.C., Cedar Rapids, for appellant father C.S.

Kelly Dean Steele, Cedar Rapids, for appellant father D.A.R.

Thomas J. Miller, Attorney General, and Kathryn K. Lang, Assistant Attorney General, for appellee State.

Julie G. Trachta of Linn County Advocate, Inc., Cedar Rapids, for minor children.

Considered by Vaitheswaran, P.J., and Doyle and Mullins, JJ.

**DOYLE, Judge.**

T.H. is the mother of four children: D.R. Jr., born in 2004; T.H., born in 2006; C.S. Jr., born in 2007; and E.L., born in 2010. D.R. Sr. is the father of D.R. Jr., and C.S. Sr. is the father of T.H. and C.S. Jr.[1] Following a hearing, the juvenile court terminated the parents' parental rights. They now appeal, separately. We affirm.

### I. Standard of Review.

Our review is de novo. *See In re J.C.*, 857 N.W.2d 495, 500 (Iowa 2014). "We are not bound by the juvenile court's findings of fact, but we do give them weight, especially in assessing the credibility of witnesses." *In re A.M.*, 843 N.W.2d 100, 110 (Iowa 2014).

### II. Analysis.

In determining whether parental rights should be terminated under Iowa Code chapter 232 (2015), the juvenile court "follows a three-step analysis." *See In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010). Step one requires the court to "determine if a ground for termination under section 232.116(1) has been established" by the State. *Id.* If the juvenile court finds grounds for termination, the court moves to the second step of the analysis: deciding if the grounds for termination should result in a termination of parental rights under the best-interest framework set out in section 232.116(2). *See id.* at 706-07. In making this determination, the primary considerations are the children's safety, their best placement for furthering their long-term nurturing and growth, and their physical, mental, and emotional conditions and needs. *See* Iowa Code § 232.116(2).

---

[1] The parental rights of E.L.'s putative father are not at issue here.

Even if the juvenile court finds "the statutory best-interest framework supports termination of parental rights," the court must proceed to the third and final step: considering "if any statutory exceptions set out in section 232.116(3) should serve to preclude termination of parental rights." *D.W.*, 791 N.W.2d at 707.

### A. Grounds for Termination.

The juvenile court terminated the fathers' parental rights pursuant to section 232.116(1) paragraphs (b) and (f). When the juvenile court terminates parental rights on more than one ground, we may affirm the order on any ground we find supported by clear and convincing evidence in the record. *See D.W.*, 791 N.W.2d at 707. The mother's parental rights were terminated under paragraph (f) only. We therefore choose to address each of the parents' grounds-for-termination challenge under paragraph (f).

Paragraph (f) requires the State to establish the child is four years of age or older, has been adjudicated a child in need of assistance (CINA), has been removed from the physical custody of the parents for at least twelve of the last eighteen months, and cannot be returned to the custody of the child's parents as provided in section 232.102. *See* Iowa Code § 232.116(1)(f)(1)-(4). Each parent challenges the fourth element—that the child could not be returned to the parent's custody.

### 1. Mother.

The mother has a long history of involvement with the Iowa Department of Human Services (DHS). In 2006, it was reported to the DHS that her oldest child—then her only child—witnessed domestic violence in her home between her and C.S. Sr. Following the DHS's assessment, it determined the child abuse

report of denial of critical care in failing to provide proper supervision was founded. The mother has since had founded child abuse reports in 2007, 2009, 2011, and then most recently, during this case, 2013. Domestic violence has continued to be a prominent issue throughout all of these cases, along with the mother's failure to properly treat and maintain treatment of her mental-health diagnoses. In each instance of reported child abuse, the DHS has stepped in and provided the mother services. In 2011, a DHS social worker that previously worked with the mother opined:

> [The mother] struggles to manage the care of these kids. She is overwhelmed and suffers from depression. [I think the mother] is the type to think she is doing good so she can stop meds or therapy or whatever so she will never be consistent with mental health treatment.
>
> [The mother] is a huge target for abusive men. . . . [I feel] that if the abusive fathers of the [children] told her to do something she would do it knowing she could get into trouble. [I think the mother] is so scared of them that she will try to make them happy. [I am] worried about this as a potential risk.
>
> [The mother] is a young mom with [four] kids and she can get very overwhelmed.
>
> [I am concerned] that it is possible [the mother] would leave the kids home alone while she ran an errand as it would be easier than taking them all with her.
>
> [I am also concerned] that [the mother] would also leave them with an inappropriate caregiver. [I believe the mother] would think that she "knows" the person and "knows" they would never hurt her kids despite them having a criminal background. [The mother] just does not think those types of things are a big deal.

The mother has shown over the years that when she is maintaining her mental-health regimen, she can generally put her children's needs first. However, she has also repeatedly shown she is unable or unwilling to maintain that routine for long periods of time, which then places her children in danger by way of her domestically-violent relationships, her substance abuse, and her lack

of supervision of the children. For instance, in 2009, it was reported two of her children, then ages two and three, were found in a nearby grocery-store parking lot alone on a Saturday night while the mother was at home. The mother denied the allegations, but only a day later, an officer drove by the mother's house and noticed two young children on the roof of her home. When the mother finally answered the door, she stated "she had been in the bathroom because the pain medication she was on," which she was taking for an injury received in another incident of domestic violence, "was making her sick and drowsy," and "she didn't know the children had gotten out onto the roof."

Most recently, the DHS became involved with the family in late 2013, after there were reports of domestic violence between the mother and D.R. Sr. while D.R. Jr. was present, as well as allegations that D.R. Jr. had been sexually abused. The DHS social worker learned the mother had been homeless for some time and had placed her children in the care of others. C.S. Sr.'s children had been in his care for about a year. The mother's youngest child had been living with a friend of the mother since April 2013. D.R. Jr. had lived with a grandparent out of state for about a year until approximately August 2013, when the mother brought the child back to Iowa. The mother and D.R. Jr. then lived with D.R. Sr. for about a month, until there was another incidence of domestic violence between the couple. The mother and D.R. Jr. next stayed with C.S. Sr. Though the mother only stayed there a short time, she left D.R. Jr., C.S. Jr., and T.H. in C.S. Sr.'s care.

After the DHS began investigating the 2013 allegations, a hair-stat test was performed on D.R. Jr.'s hair, and it tested positive for exposure to cocaine

and marijuana. In early 2014, there was domestic violence between C.S. Sr. and his paramour. Thereafter, the children were adjudicated CINA and subsequently removed from the mother's and C.S. Sr.'s care.

Since the juvenile court's most recent involvement in 2014, the mother has had three different DHS social workers assigned to her case and at least two different service providers. The mother points to this to excuse her lack of progress in the most recent case until right before the termination-of-parental-rights hearing, claiming reunification "was slowed immensely through the lack of effort and support by [the DHS]." She claims her children "have never been at risk of physical injury from [her]" and her last-minute progress evidences she should have been given more time to work towards reunification. We are unconvinced.

The juvenile court's March 2014 dispositional order advised the mother that if there were "services that [she] believe[d] would assist [her] in achieving reunification that [were] not currently offered, [she] must come forward and request those services." The orders thereafter found reasonable efforts had been made. For the first time, at the termination-of-parental-rights hearing, the mother claimed she had not been provided reasonable services by the DHS. This is not sufficient to preserve the claim for our review. *See In re C.H.*, 652 N.W.2d 144, 148 (Iowa 2002) ("In general, if a parent fails to request other services at the proper time, the parent waives the issue and may not later challenge it at the termination proceeding. If a parent has a complaint regarding services, the parent must make such challenge at the removal, when the case permanency plan is entered, or at later review hearings. Moreover, voicing

complaints regarding the adequacy of services to a social worker is not sufficient. A parent must inform the juvenile court of such challenge." (internal citations omitted)).

Furthermore, our de novo review of the record reveals the mother was offered and provided numerous services for reunification from the beginning of DHS's re-involvement with the family in late 2013, not to mention the numerous services she received in past years. The mother's most recent DHS social worker, who began working on the mother's case in April 2015, has gone above and beyond to assist the mother, and the mother complains her earlier social workers did not do more. However, her new social worker testified the mother had a very good support system before that worker entered the case, explaining the mother's service provider had

> spent extensive time above and beyond what [the social worker] normally see[s] with [service] providers in meeting with [the mother] outside of interactions, getting ahold of her to follow up on what her Case Plan expectations were, making short-term goals and long-term goals with her, taking her out for an entire day and going around and trying to fill out applications for housing. So she had significant support.
> . . . And then, of course, the mother had the opportunity for therapy and for substance abuse treatment and different formal supports.

Clearly the State provided or offered the mother reasonable reunification services.

The mother's late progress in the case did not begin until *after* the State filed its petition seeking termination of parental rights. Only then did the mother fully engage in the services offered to her, testifying she was motivated by "coming to the realization that [she] was about to lose [her] kids." However, she

admitted the children could not be returned to her care at the time of the termination-of-parental-rights hearing. We agree with the juvenile court that the State proved by clear and convincing evidence the children could not be returned to her care at the time of the termination-of-parental-rights hearing and termination of her parental rights was proper under section 232.116(1)(f).

### 2. *C.S. Sr.*

C.S. Sr., the father of T.H. and C.S. Jr., asserts the children could have been returned to his care at the time of the termination-of-parental-rights hearing because he "has the finances, intellectual capability, and housing needed to resume care." However, he admitted that last time he saw the children was in May of 2014. When asked why at the termination-of-parental-rights hearing, he replied:

> I can't really give you a reason for it. I can just tell you that after the first couple of visits, I couldn't do it anymore. I couldn't keep dealing with having my kids ripped from my hands for a reason that I didn't understand, because I could take care of my kids. I had an anger outburst and for some reason my kids were snatched from me from the life they knew from everything. For what reason, I still don't know right now sitting here talking to you. I don't understand why.

He also testified he did not participate in services during the CINA proceedings because he "was lied to [in the beginning]. It's kind of simple and plain. For DHS to even get in my household, they lied to me. So the beginning of our relationship with me with DHS has all been a lie." He asserted that if he were given more time, he would start having visits with the children and take anger management classes, even though he testified he did not believe domestic violence had an adverse effect on children. We are unpersuaded.

C.S. Sr. has a long history of domestic violence and had three prior founded child abuse reports before this case. The father himself was the victim named in a 1998 founded-child-abuse report. The mother reported a history of domestic violence between her and C.S. Sr., stating she still "struggles with memory loss from [C.S. Sr.] beating her in the head with a gun" in approximately 2008.

Most recently, in January 2014, it was reported the father assaulted another paramour while children were in the home. As a result of his so-called "outburst," his paramour suffered a broken nose, a hair line fracture, injuries to her left eye, and two concussions. The father testified at the termination-of-parental-rights hearing, "[M]y kids weren't watching what happened. I don't know where that ever came into play, because I was there. But my kids weren't watching it happen and we weren't in our home." However, the record evidences otherwise. His oldest child told the DHS social worker that day she saw her father "ke[ep] on swinging at [his paramour], hit [the paramour] in the face and her face was bloody." She also reported the paramour had a black and purple eye. The child did admit "she did not see her dad choke [his paramour] or throw her on the floor because they were in the bedroom with the door closed." His other child at issue here told the worker he heard them arguing but did not see anything until after his father hit his paramour. He told the worker the paramour had a bruise on her eye with blood on her face and cheeks and she had to go to the doctor.

Either the father was untruthful or misremembered that his children were present. Regardless, their presence is significant because—despite the father's own beliefs—domestic violence *does* have an adverse effect on children:

> Researchers have found that children who witness spousal abuse suffer from a number of psychological and emotional problems. More specifically, children suffer from internalizing problems such as depression, anxiety, and withdrawal. They also suffer from externalizing problems such as aggression, "acting out" behaviors, and delinquency. Children from violent homes may also experience impaired social competence and even post-traumatic stress disorder [ ]. Some researchers believe that children who witness spousal abuse are also at risk for substance abuse or suicide.

Amy B. Levin, *Child Witnesses of Domestic Violence: How Should Judges Apply the Best Interests of the Child Standard in Custody and Visitation Cases Involving Domestic Violence?,* 47 UCLA L. Rev. 813, 832-33 (2000) (internal footnotes omitted). "Studies estimate that children living in a home with a batterer have a 70 percent chance of becoming the victim of abuse themselves. In addition, 40 percent of suspected child abuse involves a history of family violence." Amy Allen & Susan Myres, *The Impact of Domestic Violence on Children*, 42 Hous. Law. 18, 20 (Sept./Oct. 2004) (internal footnotes omitted).

Here, the father had an opportunity to work towards reunification with his children by addressing his long-standing anger-management issues and violent tendencies, putting their needs before his own. He did not even make an attempt at it during the case. He also chose not to see his children. Given the father's long history of domestic violence, coupled with his erroneous testimony and his lack of participation in the case, it is clear his children could not be placed in his care at the time of the termination-of-parental-rights hearing. We therefore agree

with the juvenile court that the State proved termination was appropriate pursuant to section 232.116(1)(f).

### 3. *D.R. Sr.*

D.R. Sr. argues that D.R. Jr. could have been returned to his or the mother's care at the time of the termination-of-parental-rights hearing, and he requested the juvenile court grant him additional time for reunification. Having already determined the State established that termination of the mother's parental rights under section 232.116(1)(f) was appropriate, we do not address it further.[2]

D.R. Sr. also has a long history of domestic violence. In fact, the most recent case was initiated after the DHS determined the child abuse report—that this father had assaulted the mother in the child's presence—was founded. The father has another founded report of child abuse from an incident in 2006, when he physically assaulted his paramour while she was holding their child and the child was injured as a result.[3]

After the DHS became re-involved with the family in late 2013, D.R. Sr.'s whereabouts were unknown. The court eventually learned he had been incarcerated in prison in Illinois in February 2014, but he had been released on parole. However, he was then picked up for an outstanding warrant in Iowa, and at the time of the court's October 2014 hearing, D.R. Sr. was in Polk County Jail.

---

[2] We also note it is well-established that one parent does not have standing to advocate for the other's parental rights. *See In re K.R.*, 737 N.W.2d 321, 323 (Iowa Ct. App. 2007).

[3] D.R. Sr.'s parental rights to the child who was the subject of that report are not at issue here.

D.R. Sr. was released in December 2014, and there were issues with the DHS setting up visits with D.R. Jr. right away. D.R. Sr. admitted the DHS worker at that time had asked to contact his Illinois probation officer to verify he could leave the state of Illinois, but he refused because he "didn't feel comfortable letting her talk to them" and because he and that worker "butt[ed] heads a lot." After a new DHS worker began working on the case in April 2015, D.R. Sr. provided a release, and visits began shortly thereafter. That worker again requested D.R. Sr. provide his social history to better assess what his needs were so they could be addressed, but he did not provide the information until the termination-of-parental-rights hearing, explaining: "I can't make an excuse for why I didn't do it. But, you know, I work a lot and I was just thinking to myself when I was trying to fill it out, why haven't I filled this out and bring it back in. You know, shame on me." At the hearing, D.R. Sr. admitted he had been arrested in the past for domestic violence assault, not including the incident with the mother in this case, and he provided no evidence at the termination-of-parental-rights hearing that he had made any attempts to address his propensity for violence. D.R. Jr. even told others he feared his father after witnessing a few of the incidents. As pointed out above, domestic violence adversely effects children.

D.R. Sr.'s criminal activities impeded his ability to continue his relationship with his child, and thereafter, though he eventually had regular visitation, he did nothing to evidence the child could be placed safely in his care, given his history of domestic violence. We therefore agree with the juvenile court that the State proved termination was appropriate under section 232.116(1)(f).

### B. Best Interests and Statutory Exceptions.

The mother and D.R. Sr. further argue termination of their parental rights is not in their children's best interests. We address their arguments in turn.

### 1. Mother.

The mother specifically asserts she and the children share a bond and termination of that bond would be detrimental to the children. Therefore, she argues, termination of her parental rights is not in their best interests. Upon our de novo review of the record, we disagree.

At the hearing, the mother testified, "I just love my kids to death and we're just—though we may not be ready today, I will be ready, granted that I get a little more time." However, the record evidences the mother has been given time, time and time again. She has been given a myriad of chances and has been provided services over the years to demonstrate she can safely parent her children. She has only shown she can do so, or that she is only willing to do so, for short periods of time. Though the mother may not physically strike her children, her choices have put her children at risk of harm while in her care. Her children are in danger when she fails to supervise them properly, whether it is because she has chosen to discontinue mental-health treatment and medication, is self-medicating by way of illegal substances, or is taking painkillers to deal with her injuries received at the hands of her paramours. Moreover, her choice to continue domestically-violent relationships—wherein she is abused in front of her children—affect their mental and emotional health.

Additionally, the testimony at the termination-of-parental-rights hearing established the children have no more time to give her. Children are not

equipped with pause buttons. These children are in need of stability, safety, and permanency *now*—additional time to work towards reunification would not be in their best interests. The most recent DHS social worker explained the children

> have had very inconsistent attachment throughout their lives, which is evident, and they need to have permanency. It's becoming more and more difficult for them as time passes. . . .
>
> . . . .
>
> Specifically related to the boys [D.R. Jr. and C.S. Jr.], trust in caregivers, being able to develop—trusting that that bond is going to be long term. They are both—both of the boys have a hyper-vigilance that is not normal for children their age of what is going to happen to them. Is this a reliable person?
>
> . . . .
>
> [D.R. Jr. and C.S. Jr. are] very insecure in what's going to happen to them from day to day. They have no clue who and what is their forever home. [D.J. Jr.] has communicated to me that he does not want [his mother or father] to be his forever home and he doesn't want to live with them because he doesn't think it would work out.

While the mother has a bond with E.L., that child is also bonded with her foster family. D.R. Jr. and C.S. Jr. have an ambivalent relationship with the mother; both expressed doubt the mother would be an ongoing presence in their lives and have little-to-no bond with her. E.L. and C.S. Jr. are thriving with their foster families, and both homes are adoptive placements. T.H. is at an age where permanency is needed, and she is doing well in her placement with pre-adoptive relatives. Though there is some evidence of a bond between T.H. and the mother, there is no evidence termination of the mother's parental rights would be detrimental to the child. D.R. Jr. is adoptable and most in need of permanency.

Considering the children's safety, their best placement for furthering their long-term nurturing and growth, and their physical, mental, and emotional

conditions and needs, termination of the mother's parental rights is in each child's best interests, and any detriment caused by termination of the parent-child relationship is overcome by the children finally having permanency in their lives. Consequently, we agree with the juvenile court that termination of the mother's parental rights was in the children's best interests, and the statutory exceptions in section 232.116(3) do not apply to preclude the termination of her parental rights.

### 2. D.R. Sr.

D.R. Sr. also asserts termination of his parental rights is not in D.R. Jr.'s best interests because of his bond with the child. He claims:

> The child would suffer no ill effects if the father is given additional time to prove that he can adequately care for the child and keep him safe and/or assist the mother by co-parenting the child. Not only would the child suffer no harm if the father was granted more time, but both father and son would reap the benefit of spending a lifetime together as father and son.

However, the fanciful sentiment is unsupported by the record.

In fact, the record shows D.R. Jr. is in serious need of permanency. This young man has lived his short life without a home, being shuffled from relative to other persons. He was sexually abused. He tested positive for illegal substances. While the child was trying to adjust to his new surroundings, D.R. Sr. was incarcerated. D.R. Sr. was given time to show he had learned from his mistakes and had remedied his proclivity for violence. There is no evidence, other than D.R. Sr.'s self-serving statements, that he participated in a domestic-violence class while incarcerated or any other services. He chose not to provide the necessary information to the DHS, which delayed his visits with his child. The termination of his parental rights is the result of D.R. Sr.'s own choices.

Considering the child's safety, his best placement for furthering his long-term nurturing and growth, and the physical, mental, and emotional conditions and needs, we agree with the juvenile court that termination of D.R. Sr.'s parental rights was in the child's best interests, and the statutory exceptions in section 232.116(3) do not apply to preclude the termination of his parental rights.

### III. Conclusion.

The record in this case shows the parents have continually put their needs above the needs and safety of their children. Each parent has had ample time to demonstrate he or she could successfully be a parent. They have not done so, and their children cannot wait any longer for their parents to grow up.

Upon our de novo review of the record, we agree with the juvenile court that the State proved the ground for terminating the parents' parental rights under Iowa Code section 232.116(1)(f); termination of the parents' parental rights was in the children's best interests; and none of the statutory exceptions set forth in section 232.116(3) apply to overcome the need for termination of parental rights. Accordingly, we affirm the court's order terminating the parents' parental rights.

**AFFIRMED ON ALL APPEALS.**